**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
Southern Division

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2016 MAR 22  P 1: 51

CLERK'S OFFICE
AT GREENBELT

BY_____DEPUTY

PAULA STENLUND,                                   *

    Plaintiff,                                   *

                          *

v.                                                *          Case No.: GJH-14-1544

MARRIOTT INTERNATIONAL, INC.,                     *

    Defendant.                                   *

                          *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

In this slip-and-fall negligence action, Plaintiff Paula Stenlund seeks to recover damages

for injuries she sustained while she was a guest at the Panama City Marriott Hotel in Panama

City, Panama (the "Hotel"). After Defendant Marriott International, Inc. ("Marriott

International" or "Defendant") answered the Complaint, ECF No. 8, this Court issued a

scheduling order allowing for bifurcated discovery. ECF No. 12. Phase I of discovery was

limited to issues regarding the relationship between Marriott International and non-party Hotel

Properties of Panama, Inc. ("Hotel Properties"), the owner of the casino where Plaintiff alleges

she was injured. *See id.* The Parties have completed Phase I and Marriott International now

moves for summary judgment. ECF No. 26. The Motion is fully briefed and a hearing is

unnecessary. *See* Loc. R. 105.6 (D. Md.). For the following reasons, Marriott International's

Motion is granted.

I.      BACKGROUND

A. Plaintiff's Injury

For the purposes of this Motion only, the following facts are undisputed. *See* ECF No. 26-2 at 4–5; ECF No. 27-1 at 8–9.[1] On or about February 11, 2011, Plaintiff and her husband checked into the Hotel. ECF No. 1 at ¶ 14. Before and during her travel to Panama, Plaintiff received Marriott marketing material promoting the Royal Casino in Panama City, Panama ("Royal Casino" or the "Casino") as being "on-site" of the Hotel. *Id.* at ¶ 15. On February 13, 2011, Plaintiff visited the Royal Casino, and, that evening, she followed a Casino employee, at the employee's instruction, to locate the place where she could cash in her winnings. *Id.* at ¶¶ 17–18. The route involved a set of stairs, and Plaintiff descended the stairs while holding onto the railing. *Id.* at ¶ 19. Unbeknownst to Plaintiff, however, an electrical cord had been draped across the stairs from the railing to a lighted display at the top of the staircase. *Id.* ¶ 20. She tripped over the cord and fell forward, striking her head, face, and knees, causing her to suffer various severe injuries. *Id.* at ¶¶ 21, 26. The Royal Casino staff made no effort to provide Plaintiff with medical care. *Id.* at ¶ 22.

That same evening, the manager of the Hotel took pictures of Plaintiff's injuries and indicated that she would "make a full report," but the Hotel staff also failed to provide any medical care or a referral to a local hospital that evening. *Id.* at ¶ 23. The following day, the Hotel sent a doctor "or one who was held out by [the Hotel] to be a doctor," to Plaintiff's room. *Id.* at ¶ 24. The doctor did not provide any substantive care, but only referred her to a local hospital, to which the Hotel arranged transportation. *Id.* Plaintiff returned to the United States on

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

February 15, 2011, and she continued to receive evaluation and treatment for the injuries she sustained as a result of the fall. *Id.* at ¶ 25.

Plaintiff initiated this action on May 9, 2014 alleging that Marriott International breached various duties that it owed to her and other guests, including a duty to ensure her safety, to avoid or remedy unsafe conditions in the Hotel and Royal Casino, to provide or arrange for prompt medical care, to adequately train and supervise employees to detect and remedy unsafe conditions and attend to injured guests, to provide adequate warnings of dangerous conditions, and to refrain from marketing or promoting the Royal Casino once Marriott International became aware that dangerous conditions existed or likely existed at the Casino. *See id.* at ¶¶ 28–35. The Complaint alleges, in Count I, a direct liability theory of negligence, and, in Count II, vicarious liability for the negligence of employees of the Royal Casino. *Id.* at ¶¶ 28–41.

**B. Marriott International's Control Over the Hotel and Casino**

Marriott International is a publicly-traded Delaware company with its principal place of business in Maryland. ECF No. 27-1 at 1. It is a hospitality company and a worldwide operator, franchisor, and licensor of hotels and timeshare properties in several countries and territories under numerous brand names. *Id.* On August 25, 1995, Marriott International entered into an International Services Agreement (the "International Agreement") with Hotel Properties, which was to last for a term of twenty fiscal years. *See* ECF No. 44-1 at 3, 15. The International Agreement was one of many agreements specifying the scope of the relationship between Hotel Properties and Marriot International and its various subsidiaries and affiliates. *See id.* at 20. Pursuant to the series of agreements, Hotel Properties was to construct and equip a "first class, full-service international hotel" in Panama City, Panama, for which Hotel Properties was to be the owner. Marriott International Services, Limited ("Marriott Services"), a Bermuda company

and foreign subsidiary of Marriott International, was to manage and operate the Hotel. *See* ECF No. 40-1 at 6; ECF No. 44-1 at 3; ECF No. 27-1 at 2.

Pursuant to the International Agreement, Marriott International was required to "provide or cause its Affiliates to provide the International Advertising, Marketing, Promotion, and Sales Program" for the Hotel. ECF No. 44-1 at 9. Marriott International was also required to provide certain "routine corporate and regional services" including "executive supervision and support from Marriott International headquarters" and "general expertise and general operational assistance in areas such as executive supervision, employee relations, strategic planning and policy-making, research and development, energy management, retail shop operation, insurance, life safety, meal planning, food preparation and service, accounting controls, and internal auditing . . . ." *Id.* It also provided "core training programs for the benefit of management-level Hotel Employees"[2] and other unspecified training programs for "Hotel Employees," whose participation "shall be as reasonably required by Marriott [International]." *Id.* at 9–10. Hotel Properties was required to use Marriott International's Reservations System as well as its Property Management System, and Marriott International reserved the right to require Hotel Properties to use other Marriott Chain hotel systems "which systems are intended to benefit the Marriott Chain . . . ." *Id.* at 12.

On the same day that Hotel Properties and Marriott International entered the International Agreement, Hotel Properties and Marriott Services entered into a wholly separate, more detailed agreement—to which Marriott International was not a party—governing the management of the Hotel by Marriott Services (the "Management Agreement"). *See* ECF No. 40-1 at 6. Marriott International's obligations under the International Agreement were, however, conditioned upon,

---

[2] The International Agreement defines "Hotel Employee" as "any person employed by [Hotel Properties], [Marriott Services] or any of their respective Affiliates at the Hotel or elsewhere in connection with the Hotel's business." ECF No. 44-1 at 5.

among other things, Hotel Properties performing all of its obligations under the Management

Agreement between Hotel Properties and Marriott Services, as well as the other related

agreements, including a License and Royalty Agreement, Fee Agreement, and Technical

Services Agreement.[3] ECF No. 44-1 at 20.

Under the Management Agreement, Hotel Properties appointed Marriott Services as

Hotel Properties' "exclusive agent to supervise, direct, and control the management and

operation of the Hotel" for a term of twenty fiscal years. ECF No. 40-1 at 23, 29; *see also id.* at

92 ("The relationship of [Hotel Properties] and [Marriott Services] shall be that of principal and

agent . . . ."). During the term of the agreement, the Hotel was to be "known as a Marriott hotel"

and Hotel Properties was granted the right to use Marriott Trademarks. *Id.* at 55. Management of

the Hotel was under the "exclusive supervision and control" of Marriott Services, granting

Marriott Services the discretion and control "in all matters relating to management and operation

of the Hotel" including with respect to employment policies and promotion and publicity of the

Hotel. *Id.* at 23. The agreement specified that "[e]xcept for certain key Hotel Employees who at

[Marriott Services'] election may be employees of [Marriott Services] . . . all Hotel employees

shall at all times be the employees of [Hotel Properties]" but that Marriott Services maintained

the "absolute discretion regarding all Hotel Employees to hire, promote, supervise, direct, train,

fix compensation, dismiss and generally establish and maintain all employment policies and

practices . . . ." *Id.* at 66. Additionally, Marriott Services was responsible for "maintain[ing] the

Hotel in good repair and condition and in conformity with applicable laws and regulations"

which included the responsibility to "make or cause to be made such routine maintenance,

repairs and minor alterations" as may be required to fulfill that obligation. *Id.* at 43.

---

[3] Other than the Management Agreement, none of those additional agreements were made part of the record in this case.

In December 2004, the Management Agreement between Marriott Services and Hotel Properties was amended upon the proposal by Hotel Properties to open the Royal Casino adjacent to the Hotel (the "Amendment"). *See* ECF No. 41-1. Hotel Properties was the owner of the Royal Casino, which, according to the Amendment, was defined as a "separate and distinct area where any form of gaming . . . is conducted . . . and which is deemed to be separate from, and not a part of, the Hotel." *Id.* at 1. In amending the definition of "Hotel" that was provided for in the Management Agreement, the Amendment specified that "the Casino shall not be included as part of the Hotel unless and until [Marriott Services] shall become the Casino Operator."[4] *Id.* at 2. Notably, the Amendment provided that the Casino would be "operated independently and separately from the hotel," but the Amendment also stressed that "Marriott and its Affiliates cannot be placed at risk by having a Casino associated with a Marriott branded and managed property that is not operated in a reputable manner and in accordance with Legal Requirements." *Id.* The Casino was therefore required to "conform to all of the Marriott life-safety standards which are applicable to the Hotel" and "[t]he standard of operation of the Casino [was required to be] commensurate with the operating standards of Marriott and other first-class, full-service international hotels in the Central American Region." *Id.* The Casino also had two entrances: the primary entrance was outside of the Hotel and was "identifiable as a distinct entrance from the Hotel both in location and markings," and the secondary entrance was located within the Hotel. *Id.* at 2–3. In the event the Casino was not maintained to the same quality as the Hotel, or if its operation interfered in any significant respect with the operation of the Hotel, Marriott Services had the right to seal off or close the interior entrance to the Casino. *Id.* at 3.

---

[4] The Casino was managed by Gaming Properties Panama Inc., another non-party to this action. *See* ECF No. 28 at 1.

Although the Casino was subject to annual quality assurance reviews "covering such areas as guest experience, service delivery, integrity of games, maintenance and cleanliness," *id.*, Marriott Services was not to perform "any services at the Casino relating to the gaming operations or security and surveillance, nor [would] [Marriott Services] receive any revenue tied to the profitability of the gaming operations at the Casino." *Id.* at 4. To further distinguish the Hotel from the Casino operations, the Casino was to have a name independent of the Hotel name, Casino employees were required to wear different uniforms from those worn by Hotel employees which could not use or display the name "Marriott" or bear any Marriott trademarks, and the Casino operator was not permitted to use any Marriott trademarks or trade name except for any advertising material used "solely for the purpose of indicating the location of the Casino at the Hotel and provided that the word 'Marriott' [was] in a font and style different than the Trademark." *Id.* at 5. Marriott Services was permitted, however, to list the Royal Casino "as an amenity of the Hotel in the worldwide directory or in connection with any other advertising" and Hotel Properties and Marriott Services agreed in the Amendment to "participate in joint marketing programs designed to benefit both the Hotel and Casino," subject to the trademark restrictions previously mentioned. *Id.* at 6.

Finally, in 2007, Hotel Properties wished to expand the Hotel by approximately 76 guest rooms to be constructed adjacent to and above the Casino. Hotel Properties and Marriott Services again amended the Management Agreement to redefine the scope of obligations under that agreement to include Marriott Services' management of the newly constructed rooms.[5] *See* ECF

---

[5] To aid with the construction of this addition to the Hotel, Hotel Properties entered into a separate agreement with Marriott International Design & Construction Services, Inc., a Delaware corporation, which was engaged as an independent contractor to serve in an advisory capacity to assist Hotel Properties in complying with its obligations under the Management Agreement. ECF No. 30 at 10, 26, 27.

No. 41-1 at 12. This most recent addition to the Hotel, which added rooms above the Casino, was where Plaintiff and her husband stayed during their trip to Panama. *See* ECF No. 27-7; 27-12.

Marriott International was not a party to either the 2004 or 2007 Amendments to the Management Agreement. *See* ECF No. 41-1 at 8, 15. But it did have some minimal oversight over the operations of the Royal Casino through its Casino Oversight Committee (the "Oversight Committee" or "Committee"). The Oversight Committee's role in the overall Marriott enterprise was to "assure that [Marriott's] Gaming Activities [including table games, slot devices, pari-mutuel wagering, lottery terminals, etc.] are conducted in accordance with its commitment to ethical conduct, fair dealing, legal compliance and Marriott guidelines and standards." ECF No. 43-1 at 3, 5. The Committee had varying levels of oversight for gaming activities, however, depending on the level of involvement that Marriott entities had with the gaming operation at one of its hotels. *Id.* at 5. A Category I casino was one where a Marriott entity managed both the hotel and casino, which "presents the most sensitive relationship between Marriott and its Gaming Activity." *Id.* A Category II casino was one "where the hotel owner or franchisee operates the casino, or . . . where the hotel, while not managing the casino, receives income from Gaming Activities that varies based on the casino revenues." *Id.* A Category II casino required that the Oversight Committee exercise "substantial due diligence . . . because Marriott has a contractual relationship with the casino operator and/or receives a percentage of the revenue from the Gaming Activities at the property." *Id.* at 6. Category III and IV casinos were those where the relationship between Marriott entities and the casino were more attenuated, requiring correspondingly less oversight by the Committee. *Id.* The Parties agree that the Royal Casino, where Plaintiff's injury occurred in this case, is a Category II casino under the Oversight Committee's standards. *See* ECF No. 26-2 at 3; ECF No. 27-1 at 6–7. Under this category, the

8

Committee was responsible for approving the casino operator's suitability prior to that person's operation of the casino, and for conducting "annual quality assurance reviews, covering such areas as guest experience, service delivery, integrity of games, maintenance and cleanliness and other quality measures that are generally applicable to casinos located at Marriott hotels." ECF No. 43-1 at 11.

In opposition to Defendant's Motion for Summary Judgment, Plaintiff submitted an affidavit indicating that she and her husband chose to stay in the Hotel because they are members of Marriott International's Reward Program, and, when they looked online "at various Marriott website portals," they saw promotions for the Marriott Hotel in Panama City, Panama, which they understood included an "in-house, on site Casino." *See* ECF No. 27-12. Additionally, as exhibits to her memorandum in opposition to Defendant's Motion for Summary Judgment, Plaintiff submitted certain website pages that were "representative of the website pages that [she and her husband] saw and relied upon in making [their] decision to go to the Marriott Hotel" in Panama and the attached Royal Casino. *See id.* In the description of the Hotel, those websites advertise that guests could "[s]hare a cocktail or a delightful meal with friends at any of our 3 restaurants or tempt Lady Luck at our on-site casino." ECF No. 27-8 at 2; *see also* ECF No. 27-9 at 3 ("The Marriott Panama Casino hotel offers on-site gaming . . . ."). Plaintiff indicates that her traveling decisions "often depended on whether there was a Marriott at a given destination" and that "[i]t was [her] understanding that the location [she and her husband] visited was owned and operated by Marriott" and that she "did not in any way differentiate the Casino from the Hotel." ECF No. 27-12.

## II.    STANDARD OF REVIEW

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) (citing Fed.

R. Civ. P. 56(c)). The party moving for summary judgment bears the burden of demonstrating

that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d

1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support

the non-moving party's case, the burden shifts to the non-moving party to identify specific facts

showing that there is a genuine issue for trial. When ruling on a motion for summary judgment,

"[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn

in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986).

Importantly, at the summary judgment stage, it is not the Court's function to weigh the evidence

but simply to decide if there is a genuine issue for trial. *Id.* at 249. A "genuine" dispute of

material fact is one where the conflicting evidence creates "fair doubt," *Cox v. Cnty. of Prince*

*William*, 249 F.3d 295, 299 (4th Cir. 2001), such that "a reasonable jury could return a verdict

for the nonmoving party." *Anderson*, 477 U.S. at 248.

## III.    DISCUSSION

Before turning to the merits, the Court must first determine what law will apply in this

case. Although Plaintiff's alleged injuries occurred in a foreign country, she argues that

Maryland law should apply. *See* ECF No. 27 at 1. "In a diversity case, a district court applies the

conflict-of-law rules of the state where it sits." *DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796,

807 (4th Cir. 2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct.

1020 (1941)). Which substantive law must apply in a given case will depend on the nature of the action. Although Plaintiff's Complaint contains two counts—one alleging direct liability and one alleging vicarious liability—both are premised upon a single legal theory, *i.e.*, the alleged negligence of Marriott International.[6] For tort claims, including negligence, "Maryland adheres to the First Restatement of Conflict of Laws rule, *lex loci delicti commissi*, or the law of the place of the harm, to determine the applicable substantive law." *Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir. 1999). "This means the applicable law is the law of the state where the last event necessary to make an actor liable for an alleged tort takes place." *DiFederico*, 714 F.3d at 807 (internal quotation marks and citations omitted); *see also Lewis v. Waletzky*, 31 A.3d 123, 129 (Md. 2011) ("[W]hen a Maryland state court is confronted with multistate tort litigation, that court must apply the law of the place of injury as to all matters of substantive law."). Thus, because Plaintiff's injuries occurred in Panama, Panamanian law should apply to her claims. In the final analysis, however, it matters little whether Maryland or Panamanian law applies because the result would be the same in either case.

In its Motion, Marriott International argues that Plaintiff's claims cannot proceed because she "sued the wrong party in the wrong venue." ECF No. 26 at 11. According to Marriott International, the Casino owner, Hotel Properties, is responsible for maintenance and repair of the physical premises of the Casino, and, although Marriott International's foreign subsidiary, Marriott Services, manages the *Hotel*, it is, pursuant to the Management Agreement, only responsible for management of the Hotel itself; Marriott Services, according to Defendant, did not have any duties to manage or maintain the Royal Casino, which was the location of Plaintiff's accident. *See id.* at 12. And, in any event, Marriott International argues that it cannot

---

[6] *See Knowledge Boost, LLC v. SLC California, LLC*, No. CIV. WDQ-09-0936, 2009 WL 3379269, at *4 (D. Md. Oct. 16, 2009) ("Vicarious liability is an issue of substantive tort law, and all the alleged torts occurred in California; thus, California law will govern." (footnotes omitted)).

be liable for any alleged negligence on the part of its foreign subsidiary merely because it is the corporate parent. *Id.* at 37. Plaintiff disagrees, and contends that, through the series of agreements, Marriott International "tightly control[led] virtually every aspect of the [H]otel and [C]asino where Plaintiff was injured" through the establishment of management platforms and its audit and inspection requirements. *See* ECF No. 27 at 4. This level of control, she contends, supports the conclusion that an actual agency relationship existed between Marriott International and its subsidiary, Marriott Services, as well as Hotel Properties, the owner of the Hotel and Casino. Alternatively, she argues that she can prevail under a theory of "apparent authority" or "apparent agency," which is to say that, even if Marriott International did not actually control the condition that caused her injury, it could still be liable for creating the impression that Hotel and Casino guests were actually "dealing with" Marriott International. *See id.* at 16. The Court will address each of Plaintiff's arguments in turn.

**A. Actual Agency**

With respect to Plaintiff's first argument that Marriott International may be liable on the basis of an actual agency relationship between itself and Marriott Services and/or Hotel Properties, the relevant question is the degree of control that Marriott International exercised over the operations of the Hotel and Casino.[7] *See, e.g., DiFederico v. Marriott Int'l, Inc.*, No.

---

[7] Although the Complaint alleges two separate counts of negligence—one under a theory of "direct liability" and one for "vicarious liability"—based on her response in opposition to Defendant's Motion, it appears that Plaintiff's claims under both causes of action in fact relate to the same theory of recovery, which is that, through the myriad of agreements that governed Hotel Properties' relationship with the various Marriott entities, Marriott International in fact exercised so much control over the operation of the Hotel and Casino that it may be held liable for the negligence of the employees of both establishments. *See* ECF No. 27 at 2 ("[T]here is and can be no dispute that while Hotel Properties . . . owned both the Panama City Marriott Hotel and the Royal Casino . . . , they were controlled by and/or reported to Defendant Marriott International and/or its Affiliates pursuant to a series of Agreements . . . ."); *id.* at 14 (suggesting that Marriott International could be "directly or vicariously" liable to "its business invitees who are injured on facilities that it operates or controls"). In either case, the relevant determination is the extent of control that Marriott International maintained over the Hotel and Casino. *See Allen v. Choice Hotels Int'l, Inc.*, 276 F. App'x 339, 343 (4th Cir. 2008) ("Like the vicarious liability analysis, the [d]irect liability cases [also] look to the franchisor's actual control or retained right of control to determine the presence of a duty for purposes of evaluating whether the franchisor was itself negligent." (internal quotation marks and citation omitted)).

RWT 11-CV-1508, 2015 WL 5516843, at *6 (D. Md. Sept. 18, 2015) ("Most cases in Maryland and in the Fourth Circuit that have examined the question of the liability of a franchisor for injuries sustained on the premises of a hotel owned and managed by a franchisee focus on the issue of control. If the franchisor exercises direct control over a particular activity causing injury, the franchisor may be held vicariously liable."). In evaluating such a claim, the Court must "keep in mind that not every close relationship will create [vicarious] liability. One may be an agent of another, owing to his principal the fiduciary obligations of loyalty and general obedience, but at the same time not be sufficiently under the control of the principal to be considered a servant." *Chevron, U.S.A., Inc. v. Lesch*, 570 A.2d 840, 844 (Md. 1990) (citing *Brady v. Ralph Parsons Co.*, 520 A.2d 717, 730–31 (Md. 1987)). "The distinction between an agent and a servant is important because a principal will not ordinarily be liable for the negligence of an agent who is not a servant." *Schramm v. Foster*, 341 F. Supp. 2d 536, 545 (D. Md. 2004); *see also Green v. H & R Block, Inc.*, 735 A.2d 1039, 1051 (Md. 1999) ("[A] principal is not liable for any physical injury caused by the negligent conduct of his agent, who is not a servant, during the performance of the principal's business, unless the act was done in the manner authorized or directed by the principal, or the result was one authorized or intended by the principal."). And "[t]he relationship of master and servant exists only when the employer has the right to control and direct the servant in the performance of his work and in the manner in which the work is to be done." *Chevron*, 570 A.2d at 844 (citations omitted). Moreover, where the relationship is only one of agency, rather than master and servant, "the key element of control . . . must exist in respect to the very thing from which the injury arose." *Schramm*, 341 F. Supp. 2d at 546 (quoting *Cutlip v. Lucky Stores, Inc.*, 325 A.2d 432, 435 (Md. Ct. Spec. App. 1974)); *accord Wu v. Dunkin' Donuts, Inc.*, 105 F. Supp. 2d 83, 87 (E.D.N.Y. 2000), *aff'd*, 4 F. App'x 82 (2d Cir. 2001) ("In

13

deciding whether a franchisor may be held vicariously liable for acts of its franchisees [under New York law], courts determine whether the franchisor controls the day-to-day operations of the franchisee, and more specifically whether the franchisor exercises a considerable degree of control over the instrumentality at issue in a given case.").

Here, Marriott International's "control" over the operations of the Hotel was limited to: (1) providing "routine corporate and regional services" including "executive supervision and support" and "general expertise and general operational assistance" with respect to areas such as executive supervision, employee relations, research and development, insurance, life safety, accounting controls, and internal auditing; and (2) providing "core training programs" for management-level Hotel employees and other unspecified training programs for other Hotel employees. ECF No. 44-1 at 9–10. Pursuant to the International Agreement, Marriott International also required that the Hotel use Marriott International's Reservations System, Property Management System, and other Marriott Chain hotel systems "which systems are intended to benefit the Marriott Chain . . . ." *Id.* at 12. As for the control over the Casino, the only role Marriott International had in supervising the Casino operations was that the Oversight Committee had the power to conduct "annual quality assurance reviews" for issues such as "guest experience, service delivery, integrity of games, maintenance and cleanliness and other quality measures . . . ."[8] ECF No. 43-1 at 11.

This minimal oversight that Marriott International had over the Hotel and Casino is far from that which is necessary to deem Marriott International the "master" of Hotel Properties, or even its subsidiary, Marriott Services, with respect to their management and operation of the

---

[8] Although Plaintiff suggests that entering judgment against her would be improper where the "the integration, interpretation, and meaning" of the various agreements at issue in this case are "contested," *see* ECF No. 27 at 13–14, "[c]ontract interpretation is undoubtedly a question of law that may be properly determined on summary judgment." *United Servs. Auto. Ass'n v. Riley*, 899 A.2d 819, 832 (Md. 2006).

Hotel and Casino.[9] Marriott International's right to conduct annual quality assurance reviews of the Casino does not establish that it controlled the instrumentality that caused Plaintiff's injury, *i.e.*, the cord that was draped over a staircase, or that it had "the right to control and direct [Hotel Properties] in the performance of [its] work." *Chevron*, 570 A.2d at 844 (citations omitted). Nor did Marriott International's obligation to provide certain executive oversight for the Hotel mean that it was responsible for any alleged failure of Hotel employees to provide medical care after Plaintiff's injury. *See, e.g.*, *Schear v. Motel Mgmt. Corp. of Am.*, 487 A.2d 1240, 1249 (Md. Ct. Spec. App. 1985) ("The management and operation of the Chevy Chase Holiday Inn were vested entirely in [a franchisee], which in turn contracted with [a management company] . . . to manage the running of the hotel. Although Holiday retained the right to conduct periodic inspections as a means of insuring adherence to Holiday Inn standards, it took no part in the day-to-day operation of the hotel. [The franchisee] merely purchased a product from [the franchisor]—a uniform system of inn service—that carried with it an obligation to maintain certain standards prescribed by the seller."); *Triplett v. Soleil Grp., Inc.*, 664 F. Supp. 2d 645, 650 (D.S.C. 2009) (granting summary judgment in favor of hotel franchisor where plaintiff failed to present evidence that defendants "operated the [h]otel, or at least exerted control over the day-to-day operation and maintenance of the [h]otel's swimming pool and whirlpool tub" where the injury was alleged to have occurred).

Plaintiff suggests, however, that Marriott International may nevertheless be liable because, pursuant to the Management Agreement, *Marriott Services* had the obligation to "supervise, direct, and control the management and operation of the Hotel." *See* ECF No. 27 at 6;

---

[9] Plaintiff places significant emphasis on the fact that the Amendment to the Management Agreement between Marriott Services and Hotel Properties required that the Royal Casino "conform to all of the Marriott life-safety standards which are applicable to the Hotel." *See* ECF No. 27 at 7, ECF No. 41-1 at 2. Marriott International's only role with respect to that issue, however, was to provide "general expertise and general operational assistance." ECF No. 44-1 at 9.

*see also* ECF No. 27 at 14 (arguing that Defendant's obligations to business invitees were not relieved "simply because they may have been passed on to a wholly owned Affiliate"). But the mere fact that Marriott Services, which has not been made a party to this action, is a subsidiary of Marriott International is not alone enough to find any liability on the part of Marriott International. "[A]lthough the courts will, in a proper case, disregard the corporate entity and deal with substance rather than form, as though a corporation did not exist, shareholders generally are not held individually liable for . . . obligations of a corporation except where it is necessary to prevent fraud or enforce a paramount equity." *Serio v. Baystate Properties, LLC*, 60 A.3d 475, 484 (Md. Ct. Spec. App. 2013) (citation omitted). The same is true when the shareholder of a corporation is itself another corporation. *See, e.g., United States v. Bestfoods*, 524 U.S. 51, 61, 118 S. Ct. 1876 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." (internal quotation marks and citation omitted)); *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001) ("[M]ere ownership of a subsidiary does not justify the imposition of liability on the parent."). Plaintiff has not argued that there is any reason to disregard the corporate form in this case so as to hold Marriott International liable merely because its subsidiary supervises and controls the management and operation of the Hotel.[10]

Moreover, the result is the same if this Court applies the law of Panama with respect to this issue. Under the Civil Code of Panama, "commercial associations" are "juridical persons" to which "the law grants its own personality independent from that of each one of its members."

---

[10] In support of her argument that Marriott International may be held liable for the negligence of its subsidiary, Marriott Services, Plaintiff relies on *Toppel v. Marriott International, Inc.*, No. 03 CIV. 3042 (DF), 2008 WL 2854302 (S.D.N.Y. July 22, 2008), in which the court stated in a footnote: "Marriott International is not named in the Franchise Agreement, but as the parent corporation of Marriott Worldwide . . . , its potential liability in this case hinges on the potential liability of Marriott Worldwide." *Id.* at *2 n.3. This single sentence, unaccompanied by any citation, from a footnote of a decision applying New York law, is insufficient to overcome the clear authority that must apply in this case that a corporate entity is not liable for the acts of its subsidiaries, absent a reason to pierce the corporate veil.

Julio Romañach, Jr., *Civil Code of Panama 2009 Translated into English with an Introduction and Index* 31 (2009). In support of its Motion for Summary Judgment, Marriott International submitted the expert report of Jorge Federico Lee, a former Alternate Justice of the Supreme Court of Panama, who explained that, under the Commercial Code of Panama, a commercial corporation has a "juridical personality" which is "distinct from that of its partners . . . ." ECF No. 26-1 at 6; *see also DiFederico*, 2015 WL 5516843, at *5 (D. Md. Sept. 18, 2015) (relying on expert affidavit regarding the law of Pakistan and granting summary judgment in favor of defendant). Mr. Lee thus explained that Plaintiff's claim against Marriott International caused by an act or omission attributable to Hotel Properties or Marriott International's subsidiary, Marriott Services, would fail under Panamanian law. *Id.* at 8. Additionally, claims for vicarious liability under Panamanian law are limited to claims involving only certain relationships, such as that a father and mother may be liable for damage caused by their minor or incapacitated children, and that owners or directors of an establishment may be liable for damage caused by their employees. *Id.* at 9; *see also* Julio Romañach, Jr., *supra*, at 226. Marriott International was not, however, the owner of the Hotel or Casino and therefore cannot be held vicariously liable under Panamanian law for any alleged negligence of their employees. And, although Panama law recognizes that liability may flow on the basis of an agency relationship, Mr. Lee explained that an agency relationship is generally only formed through a "Commission Contract," and that no such contract exists in this case. ECF No. 26-1 at 11–12. The Court, through its own research, was unable to find anything that conflicted with Mr. Lee's statement as to the principles of Panamanian law that could apply in this case.

Notably, Plaintiff failed to respond to Defendant's argument regarding the application of Panama law in this case, asserting only that she "does not dispute Defendant's conclusion that

Maryland law will apply." ECF No. 27 at 1. Defendant, however, only argued that this Court

may apply Maryland law because "there is no conflict between the results dictated by the laws of

Maryland and the Republic of Panama . . . ." ECF No. 26 at 21–22. In failing to respond to this

argument, Plaintiff concedes the point. *See, e.g., Ferdinand-Davenport v. Children's Guild*, 742

F. Supp. 2d 772, 777 (D. Md. 2010) (dismissing claim where plaintiff failed to respond to

defendant's argument); *Kissi v. Panzer*, 664 F. Supp. 2d 120, 123 (D.D.C. 2009) ("Because the

plaintiff's opposition fails to address the defendants' arguments, the Court may treat the

defendants' motion as conceded."). Thus, regardless of whether Maryland or Panamanian law

applies in this case, Plaintiff's arguments respecting the existence of an actual agency

relationship between Marriott International and Hotel Properties or Marriott Services must fail.

### B.  Apparent Agency

Plaintiff alternatively argues that, even if there was no actual agency relationship between

Marriott International and Hotel Properties, she may recover against Marriott International on a

theory of "apparent agency."[11] In order to recover on this theory, Plaintiff must prove three

elements: (1) that the apparent principal created, or acquiesced in, the appearance that an agency

relationship existed; (2) that the plaintiff believed that an agency relationship existed and relied

on that belief in seeking the services of the apparent agent; and (3) that the plaintiff's belief and

reliance was objectively reasonable. *Bradford v. Jai Med. Sys. Managed Care Organizations,*

*Inc.*, 93 A.3d 697, 707 (Md. 2014) (citing *Chevron*, 570 A.2d at 845); *see also* Restatement

---

[11] Defendant suggests in passing that the Complaint did not provide sufficient notice that Plaintiff intended to argue a theory of apparent agency. *See* ECF No. 26 at 17, 31. Although the Complaint does not contain the precise words "apparent agency," the allegations contained therein were sufficient to provide notice that Plaintiff intended to assert such a claim. *See* ECF No. 1 at ¶ 12 ("Marriott publicly markets its association with the Royal Casino at the Marriott, and the dual and joint use of the property."); *id.* at ¶ 15 ("Before and during her travel to Panama, Ms. Stenlund reviewed Marriott marketing materials promoting the 'on-site' casino at the Marriott Panama Casino Hotel."); *see also Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 418 (4th Cir. 2014) (explaining that plaintiffs "were not required to use any precise or magical words in their pleading" to provide defendant with sufficient notice of a claim).

(Second) of Agency § 267 (1958) ("One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such."). As the Maryland Court of Appeals recently explained:

> As is evident, the doctrine of apparent agency has both subjective and objective elements: a plaintiff must show that [she] subjectively believed that an employment or agency relationship existed between the apparent principal and the apparent agent, and that the plaintiff relied on that belief in seeking [services] from the apparent agent. But the plaintiff must also show that the apparent principal created or contributed to the appearance of the agency relationship and that the plaintiff's subjective belief was "justifiable" or "reasonable" under the circumstances—an objective test.

*Bradford*, 93 A.3d at 707 (citations omitted); *see also Reserve Ins. Co. v. Duckett*, 214 A.2d 754, 759 (Md. 1965) ("It must be reasonable for the third person dealing with the alleged agent to believe that the agent has authority to act.").

Although Plaintiff submitted evidence that the Royal Casino was promoted and marketed as being Marriott's "on-site" Casino, *see* ECF No. 27-8 at 2; ECF No. 27-9 at 3, any subjective expectation that Plaintiff had regarding whether the Casino was owned or controlled by Marriott International was not objectively reasonable in light of the totality of the other facts in the record. Importantly, Casino employees were required to wear different uniforms than Hotel employees; those uniforms could not bear the name "Marriott"; the exterior entrance to the Casino was "identifiable as a distinct entrance from the Hotel both in location and markings"; and the Casino operator was not permitted to use any Marriott trademarks or trade name except for any advertising material used "solely for the purpose of indicating the location of the Casino at the Hotel and provided that the word 'Marriott' [was] in a font and style different than the Trademark." ECF No. 41-1 at 2–3, 5. The only objectively reasonable conclusion to be drawn

from these facts is that the Hotel marketing of the Casino as being "on-site" of the Hotel was "for the purpose of indicating the location of the Casino at the Hotel," *id.* at 5, rather than to create the appearance of an agency relationship between Marriott International and the owner of the Casino, Hotel Properties.

It is a closer question, however, as to whether it was objectively reasonable for Plaintiff to assume that the *Hotel* was owned, operated, and controlled by Marriott International, as opposed to being managed by a foreign subsidiary of the Defendant. And because Plaintiff alleges that the Hotel staff also breached a duty owed to her after she fell in the Casino, namely, a duty to "provide and/or arrange for prompt and appropriate medical care for her injuries," ECF No. 1 at ¶ 31, if an apparent agency relationship existed between Marriott International and Marriott Services, the entity managing the day-to-day operations of the Hotel, *see* ECF No. 40-1, then Marriott International might be liable for that alleged negligence. In support of this point, Plaintiff relies primarily on *Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156 (4th Cir. 1988), a case in which the United States Court of Appeals for the Fourth Circuit, applying North Carolina law, concluded that a hotel franchisor could be held liable in negligence on an apparent agency theory where the franchisee used the franchisor's trade name and trademarks, the franchisor "engage[d] in national advertising that promote[d] its national system, without distinguishing between company owned and franchised properties," and the franchisor "publishe[d] a directory listing the properties within its system, also without distinguishing between company owned and franchised properties." *Id.* at 166–67. On appeal from a jury verdict in favor of the plaintiff, the Court concluded that a jury could reasonably conclude that the franchisee was "was operated in such a way as to create the appearance that it was owed by" the franchisor. *Id.* at 167. Defendant, however, points to cases from other jurisdictions where courts have concluded that centralized

reservation services and uniform product branding does not create an objectively reasonable

expectation that a parent company is the apparent principal of a particular chain outlet location.

*See, e.g.*, *Carris v. Marriott Int'l, Inc.*, 466 F.3d 558, 562 (7th Cir. 2006) ("Almost everyone

knows that chain outlets, whether restaurants, motels, hotels, resorts, or gas stations, are very

often franchised rather than owned by the owner of the trademark that gives the chain its

common identity in the marketplace.").[12]

Maryland courts, it seems, have adopted the latter view. Although not presented with the

precise factual circumstances at issue in this case, in *Chevron, U.S.A., Inc. v. Lesch*, the

Maryland Court of Appeals considered whether a national oil company, Chevron, U.S.A., could

be liable in negligence as the apparent principal of an employee of a car repair shop located at a

gas station called "Walker's Chevron, Inc." In concluding that the plaintiff's negligence claim

under an apparent agency theory failed, the Court explained:

> It is indeed a matter of common knowledge and practice that distinctive colors
> and trademark signs are displayed at gasoline stations by independent dealers of
> petroleum product suppliers. These signs and emblems represent no more than
> notice to the motorist that a given company's products are being marketed at the
> station.

570 A.2d at 846 (quoting *B. P. Oil Corp. v. Mabe*, 370 A.2d 554, 559 (Md. 1977)); *see also id.*

("[One may a]s well argue, that because the word 'Chevrolet' or 'Buick' is displayed in front of

a place of business, General Motors would be estopped to claim that it was not the owner of the

---

[12] *See also, e.g.*, *Francis v. Starwood Hotels & Resorts Worldwide, Inc.*, No. 10-CV-02105-REB-KLM, 2011 WL 3351320, at *7 (D. Colo. Aug. 3, 2011) (applying Maryland law and concluding that the fact that "the toll-free phone number for the [hotel] connects directly to, and is a registered trademark of, Starwood Hotels and Resorts Worldwide, Inc. . . . , that defendant provides centralized reservation services and advertising for the hotels it manages, . . . and that the [hotel] is part of defendant's preferred guest program" do not create an objectively reasonable assumption of apparent agency); *Braucher ex rel. Braucher v. Swagat Grp., L.L.C.*, 702 F. Supp. 2d 1032, 1044–45 (C.D. Ill. 2010) (concluding that evidence showing that hotel operated a reservation system that used an 800 telephone number and an internet web site and operated a frequent traveler program did not create an apparent agency); *Crittendon v. State Oil Co.*, 222 N.E.2d 561, 564 (Ill. App. Ct. 1966) ("[W]e do not believe that the prominent display of such brand name or symbol alone, would necessarily warrant the assumption that such service station was being operated as an agency of the owner of the brand name or symbol."); *Triplett*, 664 F. Supp. 2d at 657 (noting that a hotel's use of a franchisor's logo and brand names does not suggest that franchisor owned hotel to establish existence of an apparent agency relationship).

business. It is a matter of common knowledge that these trademark signs are displayed throughout the country by independent dealers." (quoting *Reynolds v. Skelly Oil Co.*, 287 N.W. 823, 827 (Iowa 1939))). It follows, then, that, under Maryland law, the fact that the Hotel used Marriott's trade name and trademarks and that reservations for the hotel were made through a central reservation system would not satisfy the objective element required to demonstrate the existence of an apparent agency.

In any event, even if Maryland law would not compel the result that the Court reaches today, Plaintiff's claim for apparent agency must fail under Panama law. Mr. Lee, Marriott International's expert in Panamanian law, explained that the doctrine of "apparent authority" or "apparent agency" does not exist in Panama's legal system. ECF No. 26-1 at 15. Once again, because Plaintiff failed to respond to this argument, she conceded the issue. *See Kissi*, 664 F. Supp. 2d at 123. Thus, Plaintiff's argument that she can prevail on her negligence claims on the basis that Marriott International was the apparent principal of the Hotel or Casino employees must fail, and summary judgment is proper.

## IV.    CONCLUSION

For the foregoing reasons, Marriott International's Motion for Summary Judgment, ECF No. 26, is **GRANTED**, and this action is **DISMISSED** with prejudice. A separate Order follows.


Dated: March 22, 2016

GEORGE J. HAZEL
United States District Judge